Andrew C. Lauersdorf, WSBA #35418
E-mail: acl@mlrlegalteam.com
Janis C. Puracal, WSBA #39234
E-mail:  jcp@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside St., Ste. 300
Portland, OR  97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

Attorneys for Plaintiff Perienne de Jaray

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

## AT SEATTLE

| | |
|---|---|
| PERIENNE DE JARAY, | No.: |
| Plaintiff, | |
| v. | COMPLAINT FOR DAMAGES |
| ATTORNEY GENERAL OF CANADA FOR HER MAJESTY THE QUEEN, CANADIAN BORDER SERVICES AGENCY, GLOBAL AFFAIRS CANADA fka DEPARTMENT OF FOREIGN AFFAIRS AND INTERNATIONAL TRADE CANADA, GEORGE WEBB, KEVIN VARGA, and PATRICK LISKA, | (28 U.S.C. § 1331 and 28 U.S.C. § 1350 and 28 U.S.C. § 1605) |
| | JURY DEMAND REQUESTED |
| Defendants. | |

Plaintiff Perienne de Jaray alleges:

## I.  INTRODUCTION

1.     The only thing worse in this day and age than being labeled a terrorist is being ***wrongly*** labeled a terrorist.  The label breeds fear and hatred across the world.

Page 1–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER PC
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1  2.    In 2009, the Government of Canada began targeting its own

2  citizens in order to create the perception that Canada was "tough on crime"

3  and, in particular, terrorism, to win favor with the United States and secure

4  contracts for military goods and services.

5  3.    Plaintiff Perienne de Jaray was collateral damage in the wake of

6  Canada's attempt to gain favor with the United States and win itself a piece of

7  the multi-billion dollar U.S. defense industry.

8  4.    Ms. de Jaray, a bright, intelligent executive living in Bellingham,

9  Washington, was pregnant and soon-to-be-married when the Government of

10 Canada and the Canadian Individual Defendants destroyed her life by labeling

11 her as a terrorist on the basis of falsified evidence and a negligent or reckless

12 investigation.

13 5.    The Government of Canada targeted Ms. de Jaray because of her

14 father's business in Canada.  They falsified reports, or negligently or recklessly

15 reported false information, to create a criminal prosecution for export control

16 violations and attempted to turn those alleged violations—which normally

17 would draw only a monetary fine even if they were real—into an international

18 investigation and prosecution for terrorism and arms dealing ("the

19 investigation").

20 6.    The Government of Canada and the Canadian Individual

21 Defendants then lured the U.S. Federal Bureau of Investigation ("FBI") into its

22 own wrongful investigation, encouraging it to launch a full-scale attack on Ms.

23 de Jaray based on the falsified reports and negligent or reckless investigation

24 by Canada.

25 7.    Ms. de Jaray was eventually forced to leave her home in the state

26 of Washington as a result of the aggressive and relentless activity of the FBI at

Page 2–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

the insistence of the Government of Canada, its agents, and the Canadian Individual Defendants.  Ms. De Jaray lost her home, her business, her savings, her health, and her L1A Visa that allowed her to live, work, and travel in the United States as a result.

8.    Ms. de Jaray's life was destroyed, and her husband and children were put in jeopardy without evidence and without reason.

9.    The Government of Canada ultimately dropped its wrongful criminal case against Ms. de Jaray.  Still, and to this day, the Government of Canada, its agents, and the Canadian Individual Defendants have never apologized to Ms. de Jaray for the devastation they caused, and have never disclosed to the FBI the truth about the reasons for their wrongful conduct.

## II.  PARTIES

10.    Plaintiff Perienne de Jaray was a lawful U.S. resident, living in Bellingham, Washington when the Government of Canada and the Canadian Individual Defendants began their wrongful acts.  Ms. de Jaray is a citizen of Canada who now resides in British Columbia as a result of the Defendants' actions.

11.    Upon information and belief, the Attorney General of Canada (the "Attorney General") is the official representative of Her Majesty The Queen in right of Canada, a foreign state.

12.    Upon information and belief, the Canadian Border Services Agency ("CBSA") is an agency or instrumentality of Canada, a foreign state.

13.    Upon information and belief, Global Affairs Canada was formerly known as the Department of Foreign Affairs and International Trade Canada ("DFAIT") and is an agency or instrumentality of Canada, a foreign state.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

14.     The Attorney General, CBSA, and DFAIT will be collectively referred to as the "Government of Canada."

15.     Upon information and belief, George Webb is an alien and citizen of Canada.

16.     Upon information and belief, Kevin Varga is an alien and citizen of Canada.

17.     Upon information and belief, Patrick Liska is an alien and citizen of Canada.

18.     Webb, Varga, and Liska will be collectively referred to as the "Canadian Individual Defendants."

### III.  JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over the claims asserted against the Canadian Individual Defendants under 28 U.S.C. § 1331 and 28 U.S.C. § 1350, the Alien Tort Statute.  Ms. de Jaray is a foreign citizen who alleges the Canadian Individual Defendants committed torts in violation of the law of nations or a treaty of the United States.

20.     This Court has subject matter jurisdiction over the claims asserted against the Government of Canada under 28 U.S.C. § 1605, the Foreign Sovereign Immunities Act.

21.     Venue in this district is proper because a substantial part of the events giving rise to the claims occurred in this district where the Plaintiff was a lawful resident.

///

///

Page 4–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER ᴾᶜ
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## IV. FACTUAL ALLEGATIONS

**A.     Plaintiff's Background**

22.     Ms. de Jaray was a young, up-and-coming Executive Vice President at the Washington-based corporation, Apex USA.  The company was a wholly owned subsidiary of Apex Canada, and Ms. de Jaray also ran a subsidiary called Caliber Component Solutions ("Caliber").  Ms. de Jaray had an interest in Apex Canada and Apex USA (collectively, "Apex").

23.     At the time the events that are the subject of this lawsuit began, Ms. de Jaray was living in Bellingham, Washington, near the town of Ferndale where Apex USA was based and growing.  She is of Danish-American decent and Canadian by birth, but had been educated in the United States with an established career and life in Washington State.  She owned a home in Bellingham and planned to raise her family there.  Ms. de Jaray was pregnant with her first child and engaged to be married.

**B.     The Business of Apex and Caliber**

24.     Apex Canada was founded by Ms. de Jaray's father, Steven de Jaray, to provide advanced electronics manufacturing services ("EMS") to other companies.  EMS companies serve other original manufacturing companies that design and market electronic products, like LCD televisions, cellular phones, and video game consoles, for example.  EMS companies source and procure raw materials and components to manufacture electronic assemblies and then manage the inventory to fill production orders by the original manufacturer.  In some cases, EMS companies, like Apex, also provide additional services including product engineering and design, supply chain management, global distribution, and repair services.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

25.     By 2009, Apex Canada had approximately $39 million in peak annual revenue and was on track to post record earnings for the 2008 fiscal year.  Apex Canada was reported a "Top 50 Technology Company."  Apex Canada was a producer of advanced micro-manufactured electronics.  Apex Canada manufactured electronic printed circuit board assemblies for its aerospace, telecommunications, medical, automotive, and industrial manufacturing clients according to the technical specifications and requirements of the clients' end-products.  Apex Canada also performed quality assurance, functional testing, finished product assembly, and research and development for its client companies.

26.     A key part of the business model for Apex was providing complete "turn-key" electronic manufacturing services to its clients.  These services included the efficient management of all micro-electronic components and other sourcing, procurement, and administration of raw manufacturing materials for the customer.  Apex was responsible for following the requisite quality control measures, providing specialized and environmentally controlled storage, conducting technical testing of specialized advanced electronic components, and obtaining functionality certification.

27.     Apex operated in state-of-the-art production facilities and developed long-term relationships with its customers whose products were advanced and unique, and required high-quality manufacturing procedures.

28.     To meet its customers' varying manufacturing needs, Apex required a rolling supply of raw materials and electronic components, which it procured from third-party vendors.  By the nature of the industry, many components were only available on extended delivery times and in large quantities, which often far exceeded the customer's immediate demand.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

29.     The manufacturers' annual demand for product assembly was variable and made it commercially unwise, costly, and practically impossible for Apex to procure parts and components in a manner or in a quantity that met only the exact current production demand of each customer.  Instead, because Apex was able to secure preferential pricing in return for volume commitments, Apex would procure parts and components on the basis of the customer's entire annual order in quantities that far exceeded what was specifically required by the current demand.  Production rescheduling by customers and their product changes, however, often resulted in excess electronic inventory to Apex or a production shortfall requiring Apex to increase its inventory of components.

30.     Caliber was created as a subsidiary of Apex to procure and dispose of excess inventory and to trade in the secondary electronic components market.  Ms. de Jaray developed the business plan for Caliber while she was earning a degree in International Business from Pepperdine University, the well-known Christian university in California.

31.     As a part of the business, Apex and Caliber routinely shipped large volumes of electronic components to and from international and Chinese companies.

**C.     Plaintiff's Role in the Company**

32.     Ms. de Jaray was the Executive Vice President of Operations and had an interest in Apex.  She supervised all manufacturing operations at Apex USA in Ferndale, Washington.  Ms. de Jaray lived in Bellingham and, in 2005, began setting up the Washington facility to take over all production operations from the Canadian parent-company, which ultimately happened in 2008.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

33.     Ms. de Jaray was responsible for a staff of more than 80 employees and a company that had achieved over $30 million in unconsolidated annual revenue.  She oversaw a 24-hour-a-day production schedule of advanced microelectronic manufacturing for numerous large and well-known companies.

34.     As a part of the community development initiatives at Apex in Washington, Ms. de Jaray sat on the Advisory Board of the Bellingham Technical College and employed interns from Western Washington University who were studying to earn their Masters degrees.

35.     Ms. de Jaray supervised the operations at Apex USA, but had no involvement with operations at the Canadian facility, including shipments, as her work and life centered in Washington State.

**D.     The Illegal Seizure of Goods**

36.     In December 2008, Apex Canada put together a routine shipment of circuit board assemblies and components to send to Caliber in Kowloon, Hong Kong.  The components were to be assembled under contract at the Caliber facility in Hong Kong and shipped back to Canada for final manufacturing and, ultimately, the end customers of Apex Canada.  The packages were sent in the normal course of business.

37.     On December 19, 2008, Federal Express ("FedEx") retrieved the two routine packages from Apex Canada for shipment to Hong Kong.

38.     On December 22, 2008, FedEx Security Specialist Peter Scott quarantined the packages at the FedEx warehouse at the Vancouver International Airport and reported the packages as "suspicious" to the CBSA. There was nothing unusual about the packages to deem them suspicious.  The packages were consigned to Caliber in Kowloon, Hong Kong, and the waybills described the contents as "printed circuit board assembly."

Page 8–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

39.     CBSA Officer Rahul Coelho inspected the packages and concluded that the components in the packages might be controlled within the meaning of Canada's Export and Imports Act ("EIPA").  The EIPA was enacted in Canada to implement the country's international obligations pursuant to an agreement of nations called the Wassenaar Arrangement, a unified commitment among 41 nations, including Canada and the United States, to regulate international trade in conventional weapons and dual use goods and technologies.  In compliance with the Wassenaar Arrangement, the EIPA prohibits persons from exporting or transferring any goods or technology described on the Export Control List ("ECL"), unless it is in accordance with an export permit issued pursuant to EIPA.  The ECL includes a schedule of goods and technology for export to any destination other than the United States.

40.     The components in the shipment from Apex Canada were identified as two types of field programmable logic devices (the "Seized Goods"):

        a.)     SI 1048C – 50 LG F1A0608 883 ∆∆C ("SI") manufactured by Lattice Semiconductor Corporation ("Lattice") in the state of Oregon; and

        b.)     GAL 22V10D – 15LD 883 ∆∆C ("GAL") manufactured by Lattice in the state of Oregon.

41.     CBSA Officer Coelho referred the packages to DFAIT, which provides technical analysis services to CBSA in support of their joint administration and enforcement of EIPA, to determine whether the Seized Goods were listed on the ECL and, therefore, required a permit.

**E.      The Seized Goods Were Not Controlled and Did Not Require an Export Permit**

42.     The ECL provides that an electronic component may require an export permit for shipment if it meets the criteria to be classified as "Dual-use

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

List – Category 3 – Electronics." "Dual-use" goods are those that may have a civilian use as well as a particular military use.

43.     One of the primary criteria to determine whether a component like those in the Seized Goods (called a "Field Programmable Logic Device" ("FPLD")) is "dual-use" is if the component is rated by the manufacturer "for operation over the entire ambient temperature range from 218K (-55C) to 398K (+125C)."

a)     "Ambient temperature" is one of three types of temperature measurements used in microchip application design.  The other types of temperature measurement are "case temperature" and "junction temperature."  FPLDs that are not rated by their manufacturer for operation at ambient temperatures at or above -55C or at or below 125C are not considered dual-use on the ECL.

b)     In addition, an FPLD is "rated for operation" over a certain ambient temperature range when it is warranted by its manufacturer for its intended use and purpose at that temperature for an indefinite period without degradation in either functional performance or physical integrity.  An FPLD that is "rated for operation" is distinct from an FPLD that has merely survived a single manufacturing process stress test at the temperature in question, which simply involves heating (or cooling) the chip on one single occasion and discarding those that failed and were destroyed by the testing.

44.     CBSA and DFAIT reviewed publically available information related to the Seized Goods and were, or should have been, aware that the Seized Goods did not satisfy the conditions necessary to require an export permit under the ECL.  That is, the Seized Goods were not "rated for operation" at the requisite "ambient" temperature.  In fact, the manufacturer had expressly

Page 10–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1 disclaimed functional operation at the temperatures -55 and +125C.

2      45.    The information and disclaimer about the Seized Goods was listed

3 on materials generally available to CBSA and DFAIT through Apex and the

4 manufacturer of the Seized Goods.

5      46.    Over the course of nearly one month, Ben Schonfeld, a Senior

6 Technical Officer and Professional Engineer at DFAIT, gathered information

7 about the Seized Goods and corresponded with Steve de Jaray at Apex Canada

8 to request additional data and documents related to the Seized Goods.  Steve

9 de Jaray instructed the engineering department at Apex Canada to provide all

10 requested information.

11      47.    Neither Schonfeld nor anyone else at DFAIT ever contacted Plaintiff

12 as she had no involvement with the shipment of the Seized Goods.

13      48.    On January 19, 2009, Schonfeld informed Apex Canada, through

14 Steve de Jaray, that he had completed a thorough analysis based on technical

15 specifications and determined that the Seized Goods were not export controlled

16 under the ECL.

17 **F.    The Falsification of Evidence**

18      49.    Despite the Schonfeld findings determining that the Seized Goods

19 were not export controlled and did not need an export permit, Patrick Liska, a

20 Senior Engineering Advisor for DFAIT, created a document falsely stating that

21 the Seized Goods were export controlled (the "First Liska Report").

22      50.    Liska ignored Schonfeld's findings and the analysis done by

23 Schonfeld and, instead, made affirmative misrepresentations about the use of

24 the Seized Goods and their technical specifications.  Liska failed to inquire with

25 the manufacturer of the goods to verify the assertions Liska made in his

26 falsified report.  Liska, instead, based his negligent report on his own brief

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1   internet research.  Liska concluded the Seized Goods were export controlled

2   based on his own misrepresentations and the unverified information.

3       51.    The First Liska Report was disseminated through DFAIT and

4   CBSA.

5       52.    On information and belief, Ms. de Jaray understands that the

6   Government of Canada and the Canadian Individual Defendants also

7   transmitted the falsified First Liska Report to the United States Government,

8   including the FBI, in order to induce the FBI to investigate Ms. de Jaray.  The

9   FBI opened an investigation based on misrepresentations from the Government

10  of Canada and the Canadian Individual Defendants.

11      53.    Liska later admitted in an email to DFAIT's legal department that

12  "[t]he assessment report is based upon open source information rather than

13  certified documentation from the manufacturer."  He also told the legal

14  department that CBSA had "conducted the investigation on their own" and it

15  "has not been a co-operative approach[.]"

16  **G.    The Baseless Investigations**

17      54.    The Government of Canada and the Canadian Individual

18  Defendants launched a full-scale investigation into Plaintiff's father, Steve de

19  Jaray, and, without any evidence, labeled him as an international arms dealer

20  and terrorist.

21      55.    CBSA Investigator Kevin Varga was assigned to the investigation,

22  and Varga swore an Information to Obtain a Search Warrant, seeking judicial

23  authorization to search the premises of Apex Canada and Mr. de Jaray's home.

24  Varga refused to verify the First Liska Report, but relied on it and ignored all

25  other information readily available to him indicating the Report was false.

26

Page 12–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

56.     On information and belief, the Canadian Department of National Defense ("DND") wrongly told the CBSA that the Seized Goods were used for U.S. military weaponry.

57.     Based on the falsified First Liska Report, 16 armed CBSA officers invaded the business office of Apex Canada and the home of Steve de Jaray on February 13, 2009, searching for hours, seizing a laptop computer, and questioning Apex employees.

58.     The Government of Canada and the Canadian Individual Defendants continued investigating Mr. de Jaray for more than one year and did not find a shred of evidence supporting their theory that he was dealing arms or engaged in terrorism.

59.     Despite the Schonfeld findings and the lack of evidence, George Webb, a manager of CBSA, told the Government of Canada and the United States Government that "this company has to be shut down."  The Government of Canada and the Canadian Individual Defendants proceeded to contact top-level key customers and vendors of Apex, including Boeing, Rockwell Collins, GMA, and Lattice.  The Defendants also interrogated current and former employees numerous times, scaring most of them into leaving the company for fear of being connected to the alleged terroristic activity and arms dealing.  The Government of Canada and the Canadian Individual Defendants repeatedly revealed confidential details about their negligent or reckless investigation to the key customers and employees of Apex as part of the plan to "shut down" the company.  Upon information and belief, the Government of Canada and the Canadian Individual Defendants threatened those interviewed with criminal charges if they were to disclose the fact that they had been contacted.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

60.     Apex was ruined as a result of the baseless investigation.  In the first weeks after the raid, the company lost many of its key employees and 93% of its revenue from customers who heard about the raid and the interrogations.

61.     The Government of Canada and the Canadian Individual Defendants then contacted the banks where Apex did business and disclosed the ongoing investigation into "terroristic" activities.  The bank immediately called the company's operating loans, and Apex Canada was forced into receivership as a result of the Defendants' negligent, reckless, or intentional actions.

62.     The company ultimately had to close its doors, forcing the shutdown of Ms. de Jaray's Washington-based subsidiary, Apex USA.  More than 80 Washington-based employees lost their jobs, and Ferndale lost one of its most significant sources of economic development.

63.     After Apex Canada and Apex USA were shut down, Liska admitted in internal DFAIT emails to his legal department that his "assessment is based on open source info which has the disclaimer on change."  He said that "CBSA did not provide definitive spec sheets from the original US manufacturer or any definition of the capabilities of the goods from the US manufacturer."

64.     Despite his admissions in internal emails to his legal department, Liska created a second report (the "Second Liska Report") concluding that the Seized Goods were export controlled, and disseminated that report to Varga and the prosecutor to recommend criminal charges.

65.     Liska then authored a third report (the "Third Liska Report") insisting that the Seized Goods were export controlled based on his internet research.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

66.    Varga asked DFAIT's legal department whether it had any concerns before criminal charges were filed.  Despite Liska's admissions to DFAIT Legal, the officers responded, "No concerns Kevin."

**H.    The Government of Canada Files Criminal Charges Without Evidence**

67.    After more than one year of investigation and the shut-down of Apex, the Government of Canada and the Canadian Individual Defendants could not find any evidence of wrongdoing by Steve de Jaray.  The Defendants, however, filed criminal charges against him based on the falsified Liska Reports.

68.    More than one year after the investigation began and just months before charges were filed, the Defendants decided to add criminal charges against his daughter, Plaintiff Perienne de Jaray, as well.

69.    The Defendants could not produce any evidence or other basis for charges against Plaintiff.

70.    Nonetheless, on the morning of May 5, 2010, officers armed with heavy weapons and dressed in military gear seized Ms. de Jaray at a public gas station in a shopping center, screaming at her and causing her to be terrified.  Varga was the lead officer who handed Ms. de Jaray an indictment for criminal charges.

71.    Ms. de Jaray was five months pregnant at the time and had been caring for her mother after chemotherapy for breast cancer.  Unbeknownst to Ms. de Jaray, Varga and the armed guards had been sitting outside Ms. de Jaray's mother's house before they followed Ms. de Jaray to a crowded area to surround her, terrorize her, publically humiliate her, and serve her with the indictment.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

72.     Ms. de Jaray was terrified by the confrontation.  She began to experience shooting pains and contractions, and had to be rushed to the hospital.  The doctors were afraid Ms. de Jaray was going into premature labor, and Ms. de Jaray was scared that she was going to lose her baby.

## I.      The Defendants Issue an International Press Release to Announce the Charges

73.     On May 28, 2010, after the Government of Canada filed criminal charges against Ms. de Jaray and publically served her with an indictment, the Government of Canada and the Canadian Individual Defendants worked together to author a press release announcing the charges against Ms. de Jaray and her father.

74.     The press release emphasized the prison sentence to be imposed upon conviction and suggested that Ms. de Jaray and her father were terrorists who posed a threat to international security.

75.     The press release read:

**Prosecutions and Seizures**

**Pacific Region**

**CBSA charges two West Vancouver residents for contravening the *Customs Act* and *Export and Import Permits Act***

**Vancouver, British Columbia, May 27, 2010** – The Canada Border Services Agency (CBSA) announced today that it has charged two West Vancouver residents under the *Export and Import Permits Act* and the *Customs Act*.  On April 29, 2010, Steven de Jaray, 53, and Perienne de Jaray, 26, were each charged with one count of exporting goods or technology subject to export controls, without an export permit, contrary to the *Export and Import Permits Act* and one count of failing to report commercial goods for export, contrary to the *Customs Act*.

"Preventing the illegal export of goods from Canada and ensuring that goods for export meet the reporting requirements under the

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Customs Act* and the permit requirements under the *Export and Import Permits Act* are essential responsibilities of our border services officers.  These responsibilities are critical in controlling the export of strategic and dangerous goods, as well as other controlled goods that must be reported regardless of their value," state Sari Hellsten, District Director of the CBSA at Vancouver International Airport.  "Working in tandem with the Department of Foreign Affairs and International Trade Canada (DFAIT) enhances the CBSA's ability to detect illegal exports and prevent threats to international security, while ensuring that legitimate goods and travelers can cross the border efficiently."

In December 2008, two packages destined for Hong Kong were detained by border services officers at Vancouver International Airport for a secondary examination to determine the export control status of the goods contained therein.  The CBSA contacted DFAIT to carry out a technical assessment of the goods.  DFAIT determined that two types of electronic chips contained in the packages were dual-use goods included on the *Export Control List*.  A dual-use good is a commercial/civilian product that also has a significant military application.  Dual-use goods and technology require export permits for legal export from Canada.

However, no export permits were presented for the two packages that contained 5100 electronic chips valued at over $200,000.  The goods in the packages were declared as having a total value of $1,375.

In February 2009, the CBSA Criminal Investigations Division executed search warrants on the exporter's residence and business.

"Canada has a responsibility to ensure that good entering the international market from Canada do not pose a threat to international peace and security," said Neil Galbraith, Director, Criminal Investigations Division, CBSA.  "The CBSA's criminal investigators support the CBSA's public safety and economic prosperity objectives by investigating and pursuing the prosecution of those who commit criminal offences against Canada's border legislation."

The *Export and Import Permits Act* charge carries a maximum punishment of ten years in prison and a fine in an amount set by the court (there is no statutory maximum on the fine that can be set by the court).  The *Customs Act* charge carries a maximum penalty of five years in prison and a $500,000 fine.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

76.    The Government of Canada and the Canadian Individual Defendants specifically planned to disseminate the press release in a way to gather the most attention.

77.    The Government of Canada and the Canadian Individual Defendants circulated the press release in Canada, Washington State, and internationally, and posted it on the Canadian government's website where it stayed for years after the events.

78.    At the time of the press release and at all times after, the Government of Canada and the Canadian Individual Defendants knew or should have known that the Seized Goods were readily available for purchase in many countries around the world, were not made for military use, and were not export controlled.  DFAIT's own expert, Schonfeld, had already concluded that the goods were not export controlled.

79.    At the time of the press release and at all times after, the Government of Canada and the Canadian Individual Defendants knew or should have known that the fact that the Seized Goods were stress tested to a standard of "mil-883" did not mean that the goods were designed for military use or were controlled under the ECL.

80.    At the time of the press release and at all times after, the Government of Canada and the Canadian Individual Defendants knew or should have known that the Seized Goods were not designed for any specific end-use or military application and were created for many civilian applications. The Defendants had no basis to presume wrongdoing.

81.    At the time of the press release and at all times after, the Government of Canada and the Canadian Individual Defendants knew or

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

should have known that there was no evidence of wrongdoing by Ms. de Jaray. The Government of Canada had investigated for more than one year and had no evidence to suggest that Ms. de Jaray had any relationship to the shipment from Canada or any involvement in arms dealing or terrorism.  The Government of Canada and the Canadian Individual Defendants, however, proceeded to authorize the press release to tell the world that Ms. de Jaray was "a threat to international peace and security."

**J.      The FBI's Investigation**

82.    The Government of Canada and the Canadian Individual Defendants sent the falsified Liska Reports to the FBI to induce the FBI into opening an investigation into Ms. de Jaray.

83.    The FBI did open an investigation into Ms. de Jaray.

84.    The Government of Canada and the Canadian Individual Defendants worked with the FBI to interrogate Ms. de Jaray's friends and employees in the state of Washington.

85.    The Government of Canada and the Canadian Individual Defendants also worked with the FBI to interrogate customers of Apex USA in the United States.

86.    Varga told numerous customers, vendors, and employees that he was "working with the FBI."

87.    The FBI demanded Ms. de Jaray speak with them on multiple occasions and attempted to force her to testify against her own father to avoid the FBI's wrongful investigation.

88.    The FBI's investigation was based on the falsified Liska Reports and did not produce a shred of evidence against Ms. de Jaray.  Nonetheless, the FBI's aggressive investigation spanned from 2009 to at least 2013, at the

MALONEY | LAUERSDORF | REINER pc
ATTORNEY AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1  insistence of the Government of Canada and the Canadian Individual

2  Defendants.

3      89.    The Government of Canada and the Canadian Individual

4  Defendants did not tell the FBI that the Liska Reports had been fabricated or

5  that they had concluded that the Seized Goods were, in fact, not export

6  controlled.

7      90.    The Government of Canada and the Canadian Individual

8  Defendants also did not tell the FBI that, despite their years-long investigation,

9  they actually had no evidence of any wrongdoing by Ms. de Jaray.

10 **K.    Plaintiff is Forced to Leave the United States**

11     91.    The FBI's aggressive investigation based on the falsified Liska

12 Reports was a tactic used by the Government of Canada and the Canadian

13 Individual Defendants to intimidate Ms. de Jaray.

14     92.    Ms. de Jaray had a multiple-year L1A Visa as a US employer that

15 allowed her to live and work freely in the United States.  Yet, she was stopped,

16 searched, and interrogated every time she crossed the border coming home to

17 Washington after visiting her family in Canada.  At each crossing, Ms. de Jaray

18 was taken into an interrogation room by U.S. armed border guards, held in

19 isolation, and forced to answer questions about the investigation by the

20 Government of Canada and the Canadian Individual Defendants.  Ms. de Jaray

21 was not permitted to speak to her family or an attorney at these repeated

22 interrogations.  Upon information and belief, the interrogations were made at

23 the insistence of the Government of Canada and the Canadian Individual

24 Defendants.

25     93.    On numerous occasions, armed U.S. border guards at the border

26 crossing searched Ms. de Jaray's car, read her personal mail left in the car,

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

went through her purse, and seized her cellular phone to search calls and emails.

94.     On numerous occasions, armed U.S. border guards at the border crossing used tools to pull up floorboards and take off the side panels on Ms. de Jaray's car and used mirrors under the car to search for weapons.

95.     During one particularly terrifying border crossing, U.S. border guards seized Ms. de Jaray in front of her then one-year-old daughter who was traveling with her to California.

96.     Ms. de Jaray was terrified by the threats of arrest and imprisonment, and was terrified by the thought of having to leave her children without their mother.

97.     Ms. de Jaray was forced to leave her home in Washington out of fear of the FBI and the U.S. border guards who were acting upon falsified information from the Government of Canada and the Canadian Individual Defendants.

98.     Ms. de Jaray eventually lost her home to foreclosure in Washington because she could not return out of fear.

99.     Ms. de Jaray ultimately lost her L1A Visa that allowed her to live and work in the United States, and she is no longer able to return home.

**L.      Plaintiff Learns the Pretext Behind the Charges**

100.   Long after Ms. de Jaray was wrongly charged as a criminal and subjected to an aggressive international investigation, she learned the real reasons for the Defendants' conduct.

101.   The Government of Canada and the Canadian Individual Defendants were under intense pressure from the United States Government to initiate prosecutions for export control violations and to seek jail sentences for

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

those violations.  In exchange, the United States Government would grant Canada an "Exchange of Letters" ("EOL") exemption from the U.S. International Traffic in Arms Regulation ("ITAR") requirements that acted as trade barriers for Canadian defense contractors wanting to import products and sell services to the United States Government.

102.   The Government of Canada, under pressure from the United States Government, in turn, exerted pressure on CBSA, DFAIT, DND, and the Canadian Individual Defendants to produce an export controls conviction with a resulting prison sentence.  Acting under this pressure, the Canadian Individual Defendants initially targeted and persecuted Apex Canada and Plaintiff's father, Steve de Jaray.  Plaintiff was added to the indictment to be used as leverage against her father.

*1.   The Background and Significance of ITAR*

103.   ITAR is a set of U.S. regulations that control the export and import of defense-related goods and services of U.S. origin.  One purpose of ITAR is to regulate the flow of information and material related to defense and military technology.

104.   Section 126.1 of ITAR prohibits the import and export of defense goods and services of U.S. origin destined to a particular list of countries.  The list includes countries subject to U.S. arms embargos or otherwise considers unacceptable.

105.   All individual Canadian employees with or wanting access to goods and technology of U.S. origin regulated under ITAR must apply for and receive an ITAR license issued by the U.S. Department of State.  If the Canadian employee is a dual national, however, the technology is deemed to be exported to Canada as well as the individual's additional country of citizenship.  As a

Page 22–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

result, individuals working for Canadian defense firms who are dual nationals of a country on the list of prohibited countries under ITAR are automatically disqualified from having access to ITAR-controlled goods or technology of U.S. origin, absent approval from the U.S. Department of State.

106.   The ITAR rules for dual-national individuals created untenable barriers for Canadian defense companies seeking to do business with U.S. defense companies.  The complications proved unworkable with respect to a 2006 contract in which the Government of Canada contracted to purchase $30 billion of military equipment from the United States Government.

107.   In 2007, therefore, the DND entered into an agreement with the United States Government, known as the "Exchange of Letters" ("EOL"), permitting all employees of DND to be exempt from the ITAR dual-national requirements if they held security clearance of "SECRET" or above.  The exemption was extended beyond DND to the Canadian Space Agency, the Communications Security Establishment, and the National Research Council.

*2.*     *The May 9, 2008 Meeting Between Canada and the U.S.*

108.   In May 2008, the Government of Canada called a meeting with the United States Government to negotiate an extension of the EOLs for the Canadian defense industry.

109.   According to a confidential cable, the meeting was called with four specific goals in mind:  (1) "to build U.S. confidence in Canada's security organizations and services"; (2) "to get the U.S. to acknowledge that Canada is in compliance with the security screening requirements of the existing Exchange of Letters (EOLs) regarding dual-national and third country national ITAR restrictions"; (3) "to garner U.S. agreement to use the current EOLs as a template for similar arrangements with the military procurement element of

Page 23–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

[Public Works and Government Services Canada] and the airworthiness certification section of Transport Canada"; and (4) "to win U.S. support for the extension of the bilateral EOLs, or a similar arrangement to Canada's defense industry."

110.   Representatives of the Government of Canada "urged" the United States to begin discussions of EOLs for the Canadian defense industry.  They stressed that Canadian firms "must be in a position to execute support and maintenance contracts in a manner consistent with Canadian law."

111.   With respect to export controlled goods of U.S. origin, the United States specifically "asked how many investigations lead to prosecutions" and Webb, who also attended the meeting, "struck a discordant note" when he informed the U.S. representatives that the majority of arrests do not result in jail time.

112.   The United States demanded that Canada's request for EOLs would be on a *quid pro quo* basis:  "Canadian cooperation on such law enforcement issues would inform any decision about whether to extend EOL type arrangements to additional government and Canadian industry."

113.   United States representatives argued that "until the price to be paid for export control violations is the same in Canada . . . as it is in the U.S. -- prison -- adversaries will persist in abusing Canada as a venue about which they can illegally procure and export U.S. defense technologies."

114.   Based on the May 9 meeting, the Government of Canada and the Canadian Individual Defendants came under immense pressure to prosecute and convict an export control case to appease the United States Government and secure the EOLs for the Canadian defense industry.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

115.   The Government of Canada instructed its agencies to aggressively investigate possible export control violations with the goal of securing a prosecution and resulting jail time.

a)   The CBSA wrote in its Business Plan for 2009-2010:

> Strengthening the Canadian export control regime is an important component of any counter-proliferation measure and success at countering the threats posed by WMD proliferation will require all related elements of the Canadian Government to work together.  It is not a simple technical issue, nor do civil seizures and penalties provide a sufficient deterrent.  Canadian prosecution of those persons and entities engaged in this type of criminal activity is essential not only in serving to deter the proliferation of WMD but also to reinforce Canada's position with its partners in the international counter-proliferation community.

b)   DFAIT wrote in its Impact Statement on the EIPA:

> Lack of enforcement of, or inadequate enforcement of, Canada's export controls could call into question Canada's commitment to counter-proliferation, international security and multilayer export controls, thereby harming Canada's reputation as a safe and secure trading partner, with possibly serious political, diplomatic, and economic repercussions. . . . Acts of wilful [*sic*] non-compliance must be addressed in order to demonstrate Canada's commitment to international security, counter-proliferation and arms control.  It would result in negative consequences to Canada's domestic defence production industry if Canada is not perceived as robustly enforcing the export controls under its laws and regulations.

116.   The Government of Canada and the Canadian Individual Defendants persecuted Ms. de Jaray and made their investigation a public spectacle as part of its aggressive plan to be "perceived as robustly enforcing the export controls" to win favor with the U.S.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

117.   Ms. de Jaray was wrongfully charged with exporting goods that were not listed on the ECL in an effort to demonstrate to the United States that Canada was prosecuting breaches of export control regulations in exchange for the EOLs to secure ITAR relief for the Canadian defense industry.

**M.    Plaintiff Used as Leverage against Her Own Father**

118.   The Government of Canada and the Canadian Individual Defendants initiated their wrongful investigation and prosecution against Ms. de Jaray's father initially.  Ms. de Jaray was added to the indictment more than one year after the investigation began.

119.   Upon information and belief, the charges against Ms. de Jaray were laid to create leverage against Apex Canada and her father.  Despite having no involvement with the shipments in question, the Government of Canada charged Ms. de Jaray with export violations.  The Government of Canada and the Canadian Individual Defendants also persuaded the FBI to launch a full-scale investigation into Ms. de Jaray and create the impression of additional criminal charges coming in the United States if Ms. de Jaray refused to turn against her innocent father.

**N.    The Government of Canada Admits its Wrongdoing**

120.   In March 2011, the Canadian Export Consulting Services firm, an independent expert consulting firm led by the former Deputy Director of DFAIT's Export Controls Division, submitted a report to Ms. de Jaray's attorney in the criminal proceedings that proved the Seized Goods were not controlled.

121.   The independent experts wrote in their report:

> Both the GAL22V10/883 and the ispl SI 1048C/883
> PLD's are not specially designed for military use.
> Further, the parameters as described in the open
> source documentation are not within those outlined in

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Canada's Export Control List.  There is no reference to functional operability at ambient temperatures (Ta), where Ta = -55°C to +125°C, and, in fact, there is a disclaimer in both data sheets to operability at and within those temperature ranges.  Therefore, one cannot assume these devices are controlled under 1-3.A.1.a.2.c of Canada's Export Control List.

For the foregoing reasons, it is our opinion that the GAL22V10/883 and the ispl SI 1048C/883 PLD's are not enumerated in the ECL and consequently not controlled.

122.   Ms. de Jaray's defense attorneys in the criminal proceedings provided a copy of the independent experts' report to the Government of Canada, and the Government of Canada, in response, sought a report from the manufacturer of the Seized Goods, Lattice.

123.   On July 29, 2011, the Government of Canada received the report from Lattice.

124.   On August 4, 2011, the Government of Canada directed that all criminal charges against Ms. de Jaray and her father be stayed and, later, dismissed.

125.   In November 2011, Ms. de Jaray's father filed a civil lawsuit against the Government of Canada for his wrongful prosecution.

126.   In May 2013, in open court, the Government of Canada admitted its wrongdoing in the investigation and criminal charges against Ms. de Jaray and her father.

127.   The Government of Canada and the Canadian Individual Defendants did not tell the FBI that it had admitted wrongdoing or that its investigation was based on falsified evidence.  Instead, the FBI's investigation of Ms. de Jaray continued until at least November 2013.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

128.   On November 22, 2013, the Government of Canada entered into a settlement with Ms. de Jaray's father and paid him an unknown (but reportedly record) amount of money to dismiss his civil lawsuit against the Government.

129.   On November 27, 2013—five days after the Government of Canada paid to settle the claims by Ms. de Jaray's father—the FBI abruptly dropped its investigation into Ms. de Jaray without explanation.

130.   Still, the Government of Canada and the Canadian Individual Defendants never apologized to Ms. de Jaray for the destruction they caused her or issued a public statement exonerating her.  Instead, Webb told the Canadian media that this was all the "cost of doing business."

## V.  FIRST CAUSE OF ACTION:
### ALIEN TORT STATUTE

### (AGAINST CANADIAN INDIVIDUAL DEFENDANTS)

131.   Ms. de Jaray incorporates by reference her allegations in the preceding paragraphs.

132.   The Canadian Individual Defendants falsified or negligently or recklessly created false information, provided that false information to the FBI, and induced the FBI to conduct an improper investigation into Ms. de Jaray, contrary to law and fact.

133.   The Canadian Individual Defendants instituted a public campaign against Ms. de Jaray in her community in Canada and the United States, suggesting she was an international arms dealer and terrorist without evidence and, in fact, contrary to evidence proving her innocence of such charges.

134.   The Canadian Individual Defendants' actions with respect to the FBI violated Ms. de Jaray's right of safe conduct in the following nonexclusive

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

ways:

    a)    Ms. de Jaray was forced to leave her home in Washington State and seek exile in Canada for fear of wrongful arrest by the FBI;

    b)    Ms. de Jaray was prevented from returning to her home in Washington State throughout the FBI's wrongful investigation based on the Canadian Individual Defendants' misrepresentations and misconduct; and

    c)    Ms. de Jaray lost her L1A Visa authorizing safe conduct into the United States after the Canadian Individual Defendants' misconduct caused the shutdown of her legitimate company, a respected business established in Washington State.

135. The Canadian Individual Defendants' actions constitute a violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, because it was committed in violation of the law of nations protecting individuals against violations of safe conduct.

136. The Canadian Individual Defendants' misconduct was wanton, willful, reckless, or negligent.

137. The Canadian Individual Defendants' misconduct caused Ms. de Jaray to suffer irreparable harm and damages in an amount to be determined at trial in excess of $21,000,000. Damages include, but are not limited to, lost income, lost equity interest, loss of earning capacity, lost real property interest, medical expenses, attorney fees, and pain and suffering. Ms. de Jaray is further entitled to an award of punitive damages based on Defendants' wanton, willful, oppressive and/or malicious conduct.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

# VI.  SECOND CAUSE OF ACTION:
## ALIEN TORT STATUTE

### (AGAINST CANADIAN INDIVIDUAL DEFENDANTS)

138.  Ms. de Jaray incorporates by reference her allegations in the preceding paragraphs.

139.  The Canadian Individual Defendants instituted an improper investigation and prosecution of Ms. de Jaray without evidence and, in fact, contrary to evidence known to the Canadian Individual Defendants, which proved Ms. de Jaray's innocence.

140.  The Canadian Individual Defendants failed to guarantee Ms. de Jaray fair treatment during their improper investigation and prosecution by committing the following nonexclusive acts:

a)     The Canadian Individual Defendants falsified information or negligently or recklessly created false information, provided that false information to the FBI, and induced the FBI to conduct an improper investigation into Ms. de Jaray;

b)     The Canadian Individual Defendants disclosed false information to Ms. de Jaray's family, friends, employees, associates, and customers in the United States during the course of their baseless investigation;

c)     The Canadian Individual Defendants failed to disclose exculpatory evidence as they instituted and continued a pretext investigation and prosecution of Ms. de Jaray, and encouraged the FBI to do the same; and

d)     The Canadian Individual Defendants instituted a public campaign against Ms. de Jaray in her community in Canada and the United States, suggesting she was an international arms dealer and terrorist without

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

evidence and, in fact, contrary to evidence proving her innocence of such charges.

141.   The Canadian Individual Defendants' actions constitute a violation of the Alien Tort Statute, 28 U.S.C. 1350, because it was committed in violation of the law of nations and treaties of the United States, including the Inter-American Convention Against Terrorism, which requires that foreign officials taking action against a person follow applicable international law as well as the law of the state in which a person is present.

142.   The Canadian Individual Defendants failed to follow international law and Washington State law protecting Ms. de Jaray against improper investigations and prosecutions.

143.   The Canadian Individual Defendants' misconduct was wanton, willful, reckless, or negligent.

144.   The Canadian Individual Defendants' misconduct caused Ms. de Jaray to suffer irreparable harm and damages in an amount to be determined at trial in excess of $21,000,000.  Damages include, but are not limited to, lost income, lost equity interest, loss of earning capacity, lost real property interest, medical expenses, attorney fees, and pain and suffering.  Ms. de Jaray is further entitled to an award of punitive damages based on Defendants' wanton, willful, oppressive and/or malicious conduct.

## VII.  THIRD CAUSE OF ACTION: NEGLIGENCE

### (AGAINST GOVERNMENT OF CANADA)

145.   Ms. de Jaray incorporates by reference her allegations in the preceding paragraphs.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

146. Ms. de Jaray's action against the Government of Canada is authorized pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a).

147. The Government of Canada relied on falsified information or negligently or recklessly created false information, provided that false information to the FBI, and induced the FBI to conduct an improper investigation into Ms. de Jaray, contrary to law and fact.

148. The Government of Canada further authorized and instituted a public campaign against Ms. de Jaray in her community in Canada and the United States, suggesting she was an international arms dealer and terrorist, without evidence and, in fact, contrary to evidence proving her innocence of such charges.

149. The Government of Canada had a duty to protect Ms. de Jaray from false charges and public shame.

150. The Government of Canada breached its duty to Ms. de Jaray.

151. The Government of Canada's negligence has caused Ms. de Jaray to suffer irreparable harm and damages in an amount to be determined at trial in excess of $21,000,000. Damages include, but are not limited to, lost income, lost equity interest, loss of earning capacity, lost real property interest, medical expenses, attorney fees, and pain and suffering. Ms. de Jaray is further entitled to an award of punitive damages based on Defendants' wanton, willful, oppressive and/or malicious conduct.

///
///
///

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## VIII.  FOURTH CAUSE OF ACTION:
## NEGLIGENT TRAINING/SUPERVISION

### (AGAINST GOVERNMENT OF CANADA)

152.   Ms. de Jaray incorporates by reference her allegations in the preceding paragraphs.

153.   Ms. de Jaray's action against the Government of Canada is authorized pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a).

154.   The Government of Canada failed to properly train and/or supervise its agents and/or employees who then relied on falsified information or negligently or recklessly created false information, provided that false information to the FBI, and induced the FBI to conduct an improper investigation into Ms. de Jaray, contrary to law and fact.

155.   The Government of Canada further failed to properly train and/or supervise its agents and/or employees who then instituted a public campaign against Ms. de Jaray in her community in Canada and the United States, suggesting she was an international arms dealer and terrorist, without evidence and, in fact, contrary to evidence proving her innocence of such charges.

156.   The Government of Canada had a duty to train and supervise its agents and/or employees.

157.   The Government of Canada breached its duty.

158.   The Government of Canada's negligence has caused Ms. de Jaray to suffer irreparable harm and damages in an amount to be determined at trial in excess of $21,000,000.  Damages include, but are not limited to, lost income, lost equity interest, loss of earning capacity, lost real property interest,

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1   medical expenses, attorney fees, and pain and suffering.  Ms. de Jaray is

2   further entitled to an award of punitive damages based on Defendants' wanton,

3   willful, oppressive and/or malicious conduct.

### IX.   FIFTH CAUSE OF ACTION:
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (AGAINST GOVERNMENT OF CANADA)

159.   Ms. de Jaray incorporates by reference her allegations in the

preceding paragraphs.

160.   Ms. de Jaray's action against the Government of Canada is

authorized pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §

1605(a).

161.   The Government of Canada relied on falsified information or

negligently or recklessly created false information, provided that false

information to the FBI, and induced the FBI to conduct an improper

investigation into Ms. de Jaray, contrary to law and fact.

162.   The Government of Canada further authorized and instituted a

public campaign against Ms. de Jaray in her community in Canada and the

United States, suggesting she was an international arms dealer and terrorist

without evidence and, in fact, contrary to evidence proving her innocence of

such charges.

163.   The Government of Canada had a duty to protect Ms. de Jaray

from false charges and public shame.

164.   The Government of Canada breached its duty to Ms. de Jaray.

165.   The Government of Canada's misconduct has caused Ms. de Jaray

to suffer irreparable harm and damages in an amount to be determined at trial

in excess of $21,000,000.  Damages include, but are not limited to, lost

Page 34–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

income, lost equity interest, loss of earning capacity, lost real property interest, medical expenses, attorney fees, and pain and suffering. Ms. de Jaray is further entitled to an award of punitive damages based on Defendants' wanton, willful, oppressive and/or malicious conduct.

## X.  SIXTH CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND OUTRAGE
## (AGAINST GOVERNMENT OF CANADA)

166.   Ms. de Jaray incorporates by reference her allegations in the preceding paragraphs.

167.   Ms. de Jaray's action against the Government of Canada is authorized pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a).

168.   The Government of Canada relied on falsified information or negligently or recklessly created false information, provided that false information to the FBI, and induced the FBI to conduct an improper investigation into Ms. de Jaray, contrary to law and fact.

169.   The Government of Canada further authorized and instituted a public campaign against Ms. de Jaray in her community in Canada and the United States, suggesting she was an international arms dealer and terrorist without evidence and, in fact, contrary to evidence proving her innocence of such charges.

170.   The Government of Canada engaged in extreme and outrageous conduct.

///

///

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

171.   The Government of Canada intentionally or recklessly inflicted emotional distress on Ms. de Jaray.

172.   The Government of Canada's misconduct actually resulted in severe emotional distress to Ms. de Jaray.

173.   The Government of Canada's outrageous conduct has caused Ms. de Jaray to suffer irreparable harm and damages in an amount to be determined at trial in excess of $21,000,000.  Damages include, but are not limited to, lost income, lost equity interest, loss of earning capacity, lost real property interest, medical expenses, attorney fees, and pain and suffering. Ms. de Jaray is further entitled to an award of punitive damages based on Defendants' wanton, willful, oppressive and/or malicious conduct.

## XI.  JURY DEMAND

Ms. de Jaray requests a trial by jury of twelve.

## XII.  REQUEST FOR RELIEF

Ms. de Jaray respectfully requests that the Court:

1.     Award Ms. de Jaray compensatory economic and non-economic damages; and

2.     Award Ms. de Jaray punitive damages; and

///

///

///

///

///

///

Page 36–COMPLAINT FOR DAMAGES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

3.      Award Ms. de Jaray her costs and fees in this action; and

4.      Provide Ms. de Jaray such other relief as the Court finds just and

equitable.

DATED:  April 19, 2016

MALONEY LAUERSDORF REINER, PC


By  /s/ Janis C. Puracal
          Andrew C. Lauersdorf, WSBA #35418
          E-Mail: acl@mlrlegalteam.com
          Janis C. Puracal, WSBA #39234
          E-Mail: jcp@mlrlegalteam.com

Attorneys for Plaintiff Perienne de Jaray

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417