# WILL SAY STATEMENT OF THOMAS JONES AND CHRISTOPHER FAUQUIER

Thomas Jones' *c.v.* is attached as Schedule "A". Christopher Fauquier's *c.v.* is attached as Schedule "B".

Thomas Jones and Chris Fauquier are the principals of Canadian Export Consulting Services. In addition to their expertise as set out in their curriculum vitae, Tom and Chris provide individual training with companies both domestically and internationally particularly focussing on export and trade compliance. Specifically they focus on compliance with *International Traffic in Arms Regulations* ("ITAR") and the *Export Administration Regulations* ("EAR"). Specifically in Canada they do training with domestic companies, particularly in the defence and aerospace sectors, on the Controlled Goods Program as well as the Canadian Export Control List ("ECL") and how all of that interrelates with ITAR and EAR.

At any one time Mr. Fauquier and Mr. Jones are dealing with over 50 companies particularly in the defence and aerospace sectors.

Mr. Fauquier provides assessments and consulting for companies engaged in the micro-circuit industry. His principal focus is on electronics with particular experience in the defence sector.

Mr. Jones would testify as to his experience within DFAIT and in particular the history of the ITAR negotiations between the United States and Canada starting in June 1998.

As at June 1998 Canada enjoyed a general exemption under ITAR Part 126.5 ("Canadian Exemptions") in respect of goods and technologies on the United States Munitions List ("USML") with a few exceptions such as automatic weapons and nuclear weapons. Mr. Jones

has been involved on ITAR issues since 1983. He was the DFAIT "in-house" expert on ITAR as well as the EAR which covers dual-use goods and technology.

In July 1998 the U.S. government announced that it was changing the ITAR by limiting the Canadian Exemptions. Internally, it was recognized that this would mean a significant negative impact for Canadian industry.

Up until June 1998 the Canadian Exemptions were sufficiently broad that a Canadian company could freely import numerous goods on the USML from the United States without United States export authorization as long as it was for end-use in Canada. In particular Mr. Jones will comment on how commerce was done under both the USML and the associate Commerce Control List (CCL) which covers dual-use goods and is found in the EAR. The USML and the CCL are the primary export control lists maintained by the United States and until 1998 most goods and technology on these lists were license free to Canada.

Mr. Jones held, and maintains, the view that this was a trade issue because the items that the U.S. was eliminating from licence-free access to Canada were those that were related primarily to Canada's aerospace industries. The goods and technology that were being allowed "license free" to Canada, albeit, on a much pared-back list, were those goods and technology not aerospace-related. The concern was that the United States felt that the Canadian companies were taking too many of their military contracts. Particularly at the time when the Canadian dollar was at about $.65 to $.70. Accordingly in April 1999 the Americans made a change to the Canadian Exemptions that restricted a broad range of goods and technology that to that point were license-free. Note that this happened prior to 11 September 2001 and therefore the removal of the Canadian Exemptions had nothing to do with the terrorist threat that evolved after that date.

In June 2000 there was an exchange of diplomatic notes which initiated negotiations leading to an understanding that would ensure that Canada would protect U.S. goods in exchange for returning to the broader exemptions that previously existed.

Mr. Fauquier happened to represent the Canadian defence industry association in the negotiations although industry was not directly invited to the negotiations. Mr. Jones, however, was involved in those negotiations on behalf of the government of Canada. The first exchange of diplomatic notes was in June 2000. Mr. Jones was involved in drafting the Canadian half of that exchange and had input into the U.S. note.

The "Canadian condition" was that Canada would not allow the re-export from Canada of U.S. origin, USML items either on their own or incorporated into another product, or non-U.S. origins goods made, in whole or in part, with U.S. origin, USML technology, without having some form of U.S. re-export authorizations in place. Accordingly Canada needed to amend its Export Permits Regulations (EPR - under the *Export and Import Permits Act*), to satisfy the American conditions. One of the conditions was a registration program that was set up under the Department of Public Works and Government Services. It was from these efforts that the Controlled Goods Program was developed. Mr. Jones was one of two people from DFAIT who helped draft the regulations and Part 2 of the Defence Production Act that were ultimately enacted.

Mr. Jones will testify to the various legislative hurdles that were faced, but that in January 2001 the Controlled Goods Regulations were published in the Canada Gazette with a coming-into-force date of 30 April 2001.

Even with the exchange of notes, Canada only regained a portion of the previous exemptions it had enjoyed as at 1998.

After the Canadian regulations came into force, and the Bush administration came into power, the Americans added a reference in the Canadian Exemptions to ITAR Part 126.1. The effect of this change was that although a Canadian company could import certain items under the new exchange of notes and the revised Canadian Exemptions license free – if that company had an employee from one of the prohibited countries listed in 126.1 – that company would be offside ITAR because transfer of an ITAR-controlled article to the foreign born worker would be deemed a "re-export" to the foreign worker's place of birth. In other words even a Canadian citizen who, by accident of birth, was born in a 126.1 country, would be considered, under the ITAR, a dual citizen of a "prohibited" nation and access by that person to U.S. origin, USML goods or technology represented a "re-export" to that 126.1 country. This would apply even though the individual may have had top security clearance within Canada and had not violated any Canadian export regulations.

This in turn created problems for Canadian industry in that, under employment and human rights legislation, it became difficult for Canadian companies to re-assign employees who had been working on defence or aerospace projects that involved U.S. origin, USML goods or technology.

This became known as the "born-in" criterion. Although it was not a specific amendment to the American regulations (ITAR), it was applied by the U.S. as a policy interpretation.

This "born-in" criterion became so onerous for Canada that Canadian citizens born in China were, theoretically at least, not allowed to pilot Canadian F-18s because parts of the aircraft, as

well as the technology associated with the CF-18s, were of U.S. origin and were classified under the USML.

Mr. Fauquier will testify about these events because he sat on the Defence Advisory Committee, which is a group of industrialists who advised the Assistant Deputy Minister of Defence on Canadian industrial readiness as it might relate to defence programs.

The problem particularly came to a head when Canada was in the process of purchasing C17 and C130J aircraft.

The United States State Department was disallowing people born in "prohibited countries" from participating in the program. Indeed it reached a point where Michaelle Jean, then Governor General of Canada and the Commander of the Canadian Armed Forces, technically would have been prevented from flying on any United States ITAR controlled aircraft (e.g., C17, C130J and a number of helicopters) due to her being born in a proscribed nation, namely Haiti.

As a result the Assistant Deputy Minister of Materiel advised the Americans that they were going to stop the procurement of these aircraft and any other procurement until they could resolve the issue with regard to dual nationals.

Accordingly, in an exchange of letters ("EOL") in 2007 Canada and the United States agreed that persons who were employed by the Department of National Defence or the National Research Council or the Canadian Space Agency, who had government-issued security clearances at SECRET or above would not have the "born-in" criteria applied to them and would not have to be vetted by the Department of State. So the dual national issue went away for that limited sector.

The problem was that the problems did not go away for the defence industry. It only solved part of the Canadian government's problem as it related to certain Canadian Government owned assets.

In an effort to try to reduce some of the impact of ITAR on the Canadian defence industry Public Works established the "Enhanced Security Strategy" ("ESS") wherein Canada would vet information on a prescribed form to make sure those working on ITAR related programs did not pose substantive risk for technology transfer (the ESS also applied to non-ITAR-related programs).

The content of these forms was exchanged between Canada and the United States and ultimately a form was approved by the Department of State. This gave rise to the second EOL in August 2011 wherein if people were properly vetted by the Controlled Goods Program in accordance with this form, and the information was available upon demand by the United States State Department, they would grant an allowance for these workers who were born in proscribed countries to continue working on ITAR related programs. However, under the latter EOL the U.S. Department of State reserved the right to examine and vet any individuals even if approved by PWGSC.

Canadian industry was aghast at the form approved by the United States State Department. The form provided a consent on the front that any worker had to consent to having a wide range of private and personal information freely available to the Americans or other foreign governments as well as any other agency in Canada, upon demand. There was significant push back by Unions to the point where a number of people refused to sign. As a consequence these

employees were advised that if they did not sign they were subject to losing their job. Obviously this created significant difficulty particularly in the Canadian defence and aerospace industry.

The Wikileak cables involving Mr. Ruggario and his communications with Canadian officials is consistent with the pressures that Canadian industry was experiencing as a result of the ITAR requirements and the on-going press by Canadian industry on the Canadian government to secure relief from these ITAR regulations.

Indeed Mr. Jones and Mr. Fauquier experienced firsthand the express desire at the highest levels of the Canadian government to find a target to prosecute following a significant industry meeting in or about the fall of 2008. Mr. Fauquier travelled to Australia and had done some further training on ITAR and then gave a presentation to Foreign Affairs to advise them as to what was happening in Australia with respect to ITAR and how they were dealing with it. At that meeting a Senior Controlled Goods Directorate representative came up to Mr. Fauquier after the meeting and requested to see their records of the various companies they were dealing with in Canada because "they were getting pressure from the United States to prosecute someone". It was explained to them that Canada operated on voluntary compliance system in terms of reporting whereas the United States wanted to prosecute someone and make an example of them.

That statement was consistent with what the industry was hearing generally that Canada was looking for someone to prosecute – and the Ruggario cables contained in the Wikileaks confirm what industry already knew from direct dealing with the Controlled Goods Directorate.

Mr. Jones will also testify from his own experience as to how the actual investigation, and in particular the preparation and issuance of the Liska report represented a marked departure from the DFAIT standards – particularly where the report was (as was clear to Mr. Liska) going to be

used in respect of a criminal investigation and search warrant. Mr. Jones will testify that he was involved in training those carrying out the function of assessing a potential violation under the EIPA, and that the subject investigation represented a deviation from ordinary practices in a number of areas including (Mr. Fauquier will testify to a, b, and f and Mr. Jones will testify to c, d, and e):

    a) It would be patent to anyone experienced with the technical analysis of potentially export-controlled microchips that even if the Seized Devices were technically controlled, they were at worst dual-use microchips with entirely benign commercial applications in displays such as LCD televisions and video game consoles which posed no threat to national security. This would have been clear from, *inter alia*, the following:

        i. The Seized Devices were old technology which was outdated or out of production. For example, the specification sheet for GAL 22V10D-15LD/883 was, on its face, unchanged since February 1999.

        ii. The other commercial parts being shipped together with the Seized Devices was further evidence of their benign commercial end-use.

        iii. The Seized Devices, as is typical of Lattice microchips, were manufactured in the Philippines (a non-party to the Wassenaar Arrangement). Accordingly, they were almost certainly not tightly

        controlled vis-à-vis Asian purchasers. Indeed, in a report by Liska or Varga disclosed as Exhibit K11 of the criminal prosecution, the author writes "It is highly unlikely this device [another of the Lattice Devices] was originally manufactured in the United States. Most ICs are manufactured in the Asia/Pacific region".

    iv.    The Seized Devices were widely available through online brokerages for shipment to China.

b) The correspondence from DFAIT's Benjamin Schonfeld to the Plaintiff prior to the First Liska Report demonstrates that he was analyzing the Seized Devices only as dual-use goods (Group 1). DFAIT thus initially recognized that the Seized Devices were not specifically designed for military applications (which would have resulted in them being analyzed under Group 2). The subsequent inquiries to DND military intelligence regarding military applications such as "US Strategic Bombers" (and the statements in the Second and Third Liska Report about potential use of the Seized Devices in "warheads" or "desert or arctic environments") were not only wrong, but also irrelevant to the determination of whether the Seized Devices were controlled under Group 1.

c) DFAIT's practice prior to the Plaintiff's case was that, when a technical analysis was challenged by the exporter, the DFAIT supervisor would approach the original analyst to confirm the analyst's position, as well as

ask another analyst to conduct a separate, "cold" assessment with the same materials available to the original analyst. If both analysts agreed that the items were export controlled, then DFAIT would provide both analysts with the defence opinion and ask them to refute it. If they were unable to do so, then DFAIT would normally abandon its position. DFAIT diverged from the usual practice in respect of the Plaintiff's case in that, *inter alia,* it essentially ignored the Plaintiff's representations that the Seized Devices were not controlled, and failed to obtain a second opinion in the face of that challenge. In fact the DFAIT document which did have two signatures dated January 23, 2009 effectively concluded that the devices were benign from a control perspective. Yet the Liska Report was not reviewed by a second technical officer.

d) The overwhelming policy and practice of the CBSA and DFAIT for alleged technical breaches of the *Export and Import Permits Act* in the case of dual-use (Group 1) goods (by definition not specially designed for military use) was to utilize the Administrative Monetary Penalty System ("AMPS") regime (which would not preclude laying criminal charges at a later date). Assessing an administrative fine achieves the objective of deterring future non-compliance and provides a forum for full consideration of the exporter's submissions as to why the goods are not controlled. Had the Defendant followed its usual practice and assessed an administrative fine, the errors in the First Liska Report would have been identified prior to the search and charges (and Press Release).

-4-

e) In the normal course, the usual arrangement is that CBSA prosecutes export control violations at time of export and the RCMP (with the direct assistance of DFAIT) investigates and prosecutes export control offenses post-export although this is not an exclusive differentiation and both enforcement agencies can, and do, post-export investigations. In respect of the Plaintiff, the CBSA was the driving force in the investigation and prosecution from no later than February 2, 2009.

f) In addition, particularly in respect of the First Liska Report it would have been expected that someone in Mr. Liska's position would be aware of the changes in Wassenaar, and the fact that the issue of "Toggle speed" had been removed as a "control" criterion under Wassenaar and the ECL. With that knowledge it would be contrary to established practice to suggest that any further steps be taken, including an AMP's penalty where the offending item was no longer a "listed" item under current Wassenaar and soon to be removed from the ECL.

SIGNED:

_____          _____
THOMAS JONES                                                    CHRISTOPHER FAUQUIER

19 NOVEMBER 2013                                        15/11/2013
Date                                                                    Date

004703-0002/00034431

**Canadian Export Consulting Services** 



Telephone **(613)825-5080**
Cellphone **(613)889-5080**
Facsimile **(613)825-2825**
Email **tejconsulting@rogers.com**

Thomas E Jones, B.A. (International Relations)

Tom graduated from the University of British Columbia with a degree in International Relations (1973). He joined Revenue Canada (Customs) in 1973 and over the course of his career held assignments in the Departments of Industry, Trade and Commerce, External/Foreign Affairs, National Defence and International Trade Canada.

From 1990 until his retirement in December 2004, Tom was Deputy Director (Technology), Export Controls Division, Department of Foreign Affairs and International Trade. He spent a total of 18 years in the Export Controls Division in two separate assignments. Tom had two primary responsibilities: To negotiate, in a multilateral context, technical parameters of goods and technology contained in Canada's Export Control List; and, to harmonise Canadian and multilateral export control policies and procedures. The overall objective was to ensure that goods and technology are not exported to countries or entities involved in the research, development or manufacture of weapons of mass destruction or to countries or regions where the influx of conventional weapons, or the materials that could be used in the development of conventional weapons, could negatively impact international peace and security.

Although involved in many significant issues over the years, a highlight of Tom's career was the high level discussions with the United States (1998-2001) concerning Canada/U.S. defence trade, and the impact the U.S. International Traffic in Arms Regulations (ITAR) had, and still has, on this trade. In response to U.S. concerns, he was involved directly in the drafting and implementation of new export control Regulations, as well as the Act and Regulations that established Canada's Controlled Goods Program.

In addition to Canadian export controls, Tom has developed considerable expertise in export control laws, policies and procedures of Canada's major trading partners. Early on in his career Tom also gained direct, practical and extensive experience in Customs' Tariff, Valuation, Anti-dumping and Countervail issues and cases.

Tom and his wife, Angela, have lived in Ottawa since 1974 where they raised their 3 boys.

Revised: 15 October 2013

Canadian Export Consulting Services 

# Basis for Knowledge (1973-2004)

- **To negotiate, in a multilateral context, technical parameters of goods and technology contained in Canada's Export Control List:**
  - As Head of the technical section of the Export Controls Division from 1990 until my retirement in 2004, I was responsible for leading Canadian negotiations in the various export control regimes on what should/should not be contained in the export control lists of the respective regimes and ultimately on Canada's Export Control List (ECL)

- **To harmonise Canadian and multilateral export control policies and procedures:**
  - As a Permit Officer in the Export Controls Division (1982-1986; 1989-1990) and then as Head of the technical section (1990-2004), I was responsible for identifying and managing Canadian policies on export controls and, where warranted, drafting and implementing regulatory, and in some cases, legislative changes to Canadian export controls

- **A career highlight was the high level discussions with the United States (1998-2001) concerning Canada/U.S. defence trade:**
  - In 1983 I became responsible for managing Canada-U.S. export control harmonisation and from that point I worked extensively with U.S. export control authorities on issues associated with Canada/U.S. export controls
  - During a series of Canada/U.S. high level export control meetings (1983-86), I was responsible for having a detailed and extensive understanding of U.S. export controls
  - From 1989 to my retirement in 2004 I was the in-house expert on U.S. export controls (Export Administrations Act/Regulations and the Arms Export Control Act/International Traffic in Arms Regulations (ITAR)) and in 1998 was asked to lead the high level technical discussions on Canada/U.S. export controls, and more specifically, the ITAR

- **The impact of the U.S. International Traffic in Arms Regulations (ITAR) on Canadian trade:**
  - From 1983 to 1986 and then from 1989 to 2004 I was the in-house expert on ITAR

- **Directly involved in the drafting and implementation of new export control Regulations:**
  - Over the years I was responsible for drafting, in consultation with the Canadian Department of Justice, numerous regulations associated with Canadian export controls as well as other Acts of Parliament that impacted Canadian export controls. Some of the Acts and Regulations I have drafted:
    - Export and Import Permits Act plus various Regulations
    - Export Control List (numerous)
    - Export Permits Regulations
    - Technical Data Control Regulations (Defence Production Act)

- **Directly involved in the Act and Regulations that established Canada's Controlled Goods Program (CGP):**
  - As Head of the technical section, and working in concert with representatives of PWGSC and the Department of Justice, I was a major contributor to the drafting of Part 2 of the Defence Production Act and the associated Controlled Goods Regulations to ensure that Canada met its obligations under the Canada-U.S. Defence Trade Arrangement (ITAR negotiations) in the 1998-2001 period. Until my retirement in 2004 I was directly involved in the administration of the CGP

**Canadian Export Consulting Services** 

- **Developed considerable expertise in export control laws, policies and procedures of Canada's major trading partners:**
    - In order to ensure that Canadian export control laws and policies were on a level playing field with those of Canada's major trading partners and countries involved in the same export control regimes as Canada, it was necessary to understand, in some detail, the export control laws of those countries

- **Gained direct, practical and extensive experience in Customs' Tariff, Valuation, Anti-dumping and Countervail issues and cases:**
    - From 1974-1982 I was a desk officer in the Valuation Division and the Anti-Dumping and Countervail Divisions of Customs and Excise
    - I was responsible for investigating valuation cases and then anti-dumping and countervail cases
    - Both areas required a working knowledge of Canada's Customs' Tariff
    - It was during this period that I was able to hone my investigative skills

## Basis for Knowledge (2004 - Present)

- **In order to determine if there have been any changes in Canadian legislation or regulations vis a vis export and/or domestic controls, or in the Canada Border Services Agency laws or regulations, I consult, on a regular basis:**
    - The Canada Gazette Parts I, II and III;
    - The government websites that are associated with the administration of the associated laws or regulations;
    - Individuals identified in the Gazette entries commenting on the entry or requesting clarification; and
    - Desk officers or managers of the Divisions responsible for the administration of the laws and regulations.

- **In order to determine if there have been any changes in U.S. ITAR or EAR legislation, or in the administration or enforcement of U.S. export controls, I consult, on a regular basis:**
    - The U.S. Federal Register;
    - The State Department, Commerce Department and Homeland Security websites; and
    - Trade and related magazines and other written sources.

- **In order to maintain expertise in export control laws, policies and procedures of Canada's major trading partners (other than the U.S.), I consult, on a regular basis:**
    - The websites of the various export control regimes;
    - The websites of the countries that administer export controls; and
    - Trade and related magazines and other written sources.

- **In order to maintain a general, and in some cases a detailed understanding of export and domestic controls I participate, *pro bono*, in various Committees including:**
    - The International Committee of the Canadian Association of Defence and Security Industries (CADSI);
    - The Industry Engagement Committee (IEC) of Public Works and Government Services Canada/Controlled Goods Program; and
    - Other Committees, as required.

**Canadian Export Consulting Services** 



Telephone  (705)325-7288
Cell Phone  (613)798-3191
Email  fauquier@sympatico.ca

Christopher Fauquier, P. Eng
Senior Partner, CECS

Chris is a licensed engineer and has been involved with the Aerospace and Defence Industry for over 43 years. He graduated as an electrical engineer specialising in computer architecture, and began work at Garrett Manufacturing Ltd. in 1970. From there he entered the corporate sales force and assumed a number of positions with the Garrett Corporation including government relations in Washington. Upon his return to Canada in 1983 he was appointed the Divisional Vice President of Sales for Garrett Manufacturing Ltd., responsible for sales of its microcircuit products and aerospace control products worldwide. In 1986 he was made the Corporate Vice President of Government Relations in Ottawa for the newly formed Aerospace and Defence Company, Allied Signal.
In 1992 he formed Born Consultants Ltd. and began consulting for a number of major aerospace and defence companies. At the same time he and other partners started a manufacturing company – Tulmar Safety Systems Inc.. Tulmar grew from 3 employees to a manufacturer of life support equipment employing over 90 people. He also started a company, TECOPS Ltd. that supplied tactical surveillance systems to the RCMP, FBI, NSA, and a number of police organizations throughout the world. In 2005 he sold his shares in TECOPS and Tulmar in order to concentrate on the growth of his consultancy firm, in particular, Canadian Export Consulting Services (CECS).
During his career in industry he held numerous positions in associations promoting the SME community. In particular he was the industrial representative from the Canadian Defence Industries Association, (CDIA) that advised the government on the Controlled Goods Program and the impact that the program would have on Canadian Business. He was also contracted by the Department of Foreign Affairs to perform technical assessments in the furtherance of export permit applications.

Chris is a director of SODA (Southern Ontario Defence Association), representing small and medium-sized businesses. In late 2011, and after many years of volunteer service, he resigned from the NATO Industrial Advisory Group (NIAG), and the Defence Industrial Advisory Committee (DIAC) which were responsible for advising the DND Assistant Deputy Minister (Materiel) on defence industrial issues. A specific issue he advised the Assistant Deputy Minister on was that of the impact that the ITAR would have on Canadian Industry and particularly the impact it would have on the Canadian Supply Chain.

**Canadian Export Consulting Services** 

Currently he sits on the Industry Engagement Committee convened by the Controlled Goods Directorate which advises the Controlled Goods Directorate of issues that affect Canadian Industry.

Additionally he is a member of the International Marketing Committee of CADSI, - The Canadian Defence and Security Industries Association where he regularly advises the association on matters relating to Export Trade Compliance.